[Civ. No. 4039. Second Appellate District, Division Two.—July 26, 1923.]

A. HALDEN JONES et al., Appellants, v. SIERRA VERDUGO WATER COMPANY (a Corporation), et al., Respondents.

[1] CORPORATIONS—ORGANIZATION OF NEW COMPANY—DEFAULT IN PAYMENT OF BONDS—RIGHT OF HOLDERS TO FORECLOSE.—The organization of a new water company by the stockholders of a water company for the purpose of acquiring the property of the latter company in the event that it should be sold at trustee's sale, standing alone and considered as an isolated fact, cannot prejudice the right of the bondholders of the latter company to cause the property to be sold to satisfy the bonds held by them if and when the latter company should default in the payment of its bonds.

[2] ID.—DISREGARD OF RIGHTS OF BONDHOLDERS—MOTIVE.—The fact that the stockholders of a water company contemplate a reorganization might possibly furnish them with a motive for disregarding the rights of the bondholders of the company, but unless the latter can show that their rights have actually been invaded the law will not concern itself with a possible motive for their invasion.

[3] ID.—LAWFUL SALE PURSUANT TO DEED OF TRUST—ORGANIZATION OF NEW COMPANY TO MAKE PURCHASE.—Where bondholders constituting the owners of more than fifty per cent of the outstanding

bonds of a water company have the legal right to demand that a sale of the property of the company be made by the trustee under the deed of trust given to secure the payment of such bonds, and the sale is conducted according to the conditions provided by such trust deed, with due regard to the rights of all the parties, and is made to the highest bidder, the fact that the stockholders of the company, in organizing a new company, had in mind the possible purchase of the properties by such new company could afford no ground for setting aside the sale, at the instance of the minority bondholders of the old company.

[4] ID.—FAILURE OF STOCKHOLDERS TO SUPPLY FUNDS—BONDHOLDERS' RIGHTS NOT AFFECTED.—The failure of the stockholders and directors of the old company to supply the necessary funds by assessment or "call," in order to prevent the company from defaulting on its bonds, furnishes no reason why the property of the company should not be offered for sale by the trustee on a proper request therefor by the holders of fifty per cent in amount of the bonds outstanding, as provided by the deed of trust given to secure the payment of such bonds.

[5] ID.—PERMISSION OF DEFAULT BY BONDHOLDERS—ESTOPPEL TO REQUEST SALE—PLEADING.—However censurable the stockholders of a company may be for their neglect to raise the money wherewith to pay the bonds of that company without compelling resort to a sale under the trust deed given to secure the bonds, such of the bondholders as are not stockholders have the indubitable right to demand a sale by the trustee; and if the minority bondholders who would seek to set aside the sale would claim that the sale is void because the holders of fifty per cent in amount of the outstanding bonds were of those stockholders who made it impossible for the company to raise the necessary funds wherewith to pay the maturing interest on its bonds as it fell due, the burden is upon them to show that fact by appropriate averment in their complaint.

[6] ID.—RIGHT TO DEMAND SALE—INDUCEMENT BY DIRECTORS.—The holders of at least fifty per cent in amount of the outstanding bonds having had the absolute right to demand that the property of the company be sold after default in the payment of the interest, the sale by the trustee was not invalidated by the fact that directors of the company induced said bondholders to request the trustee to sell.

[7] ID.—INADEQUATE PRICE—VALID SALE.—It having been the right and duty of the trustee to offer the property for sale and to sell it to any person or corporation who would make the highest and best bid, the inadequacy of price, however gross, was not of itself sufficient ground for setting aside the sale legally made, where such inadequacy of price was not attended by circumstances of fraud, misconduct, accident, mistake, or surprise tending to influence the result by preventing the property from bringing its value.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles S. Burnell, Judge. Affirmed.

The facts are stated in the opinion of the court.

John B. Haas for Appellants.

A. I. McCormick and Page & Hurt for Respondents.

FINLAYSON, P. J.—Plaintiffs, who hold bonds issued by the defendant Sierra Verdugo Water Company, brought this action to set aside a trustee's sale had under the deed of trust which had been given to secure payment of the bonds. The defendants Crescenta Mutual Water Company and Hellman Commercial Trust & Savings Bank filed, each of them, a general demurrer to the complaint. The demurrers were sustained. Plaintiffs, refusing to amend, appeal from the judgment which was entered in favor of the defendants after the order sustaining the demurrers.

The facts as set forth in the complaint are substantially as follows: On March 10, 1915, the Sierra Verdugo Water Company, a mutual water company incorporated under the laws of this state (hereinafter for brevity referred to as the Verdugo company), desiring to incur a bonded indebtedness of $150,000, authorized its secretary and president to issue 1,500 of its bonds of the denomination of $100 each, 100 of the bonds to be payable on December 31, 1918, and an additional 100 on the thirty-first day of December of each year thereafter, the bonds to bear interest at seven per cent per annum payable semi-annually. To secure the payment of these bonds the Verdugo company, on May 28, 1915, executed to the Hellman Commercial Trust & Savings Bank (hereafter for brevity referred to as the trustee) a trust deed conveying all of its property, real and personal. Of the bonds issued by the Verdugo company the plaintiff Jones owns and holds thirty-two and the plaintiff Martens thirty. It is provided in the deed of trust that if the Verdugo company should default for six months or more in the payment of any installment of the interest provided for in the bonds, the trustee, upon the written request of the holders of fifty per cent or more in amount of the bonds outstanding, shall declare all of the bonds due and payable and

thereupon shall proceed to sell the property described in the trust deed.

The Verdugo company having defaulted in the payment of interest, and certain of the bondholders having demanded that the property be sold, the trustee, on June 18, 1921, offered the property for sale under the trust deed. The defendant Crescenta Mutual Water Company (hereafter, for brevity, referred to as the Crescenta company)—the sole bidder at the trustee's sale—made an offer of $10,595 for all of the property. The trustee accepted this bid and was about to execute a deed to the Crescenta company and accept payment of the $10,595, when plaintiffs brought this action to have the sale set aside and the trustee enjoined from executing a deed to the purchaser.

The Crescenta company was organized July 26, 1920. Like the Verdugo company, it also is a mutual water company incorporated under the laws of this state. Prior to the organization of the Crescenta company the stockholders and directors of the Verdugo company, who were the owners of the acreage served with water by that corporation, agreed among themselves to organize a mutual water company to serve with water the same territory which then was being served by the Verdugo company. They further agreed among themselves not to pay any of the principal or interest on the bonds that had been issued by the Verdugo company but to allow the property of that corporation to be sold under the trust deed. Pursuant to such agreement the stockholders and directors of the Verdugo company organized the Crescenta company for the purpose of taking over the property of the Verdugo company when the same should be sold under the trust deed. For that purpose they raised sufficient money to organize the Crescenta company and to drill wells and develop water on the property of the Verdugo company. The money so raised by them was sufficient to have rehabilitated the Verdugo company and to have provided sufficient funds wherewith to have paid the principal and interest of the bonds as the same fell due. The stockholders of the Verdugo company neglected to pay an assessment levied by that company on August 1, 1918, and also neglected to pay the subscription prices on their shares of the Verdugo company's capital stock, although they were financially able to pay such assessment and such unpaid sub-

scriptions had the proper steps been taken by the board of directors of the Verdugo company to compel payment. The assessment and unpaid stock subscriptions were not paid because the directors and stockholders of the Verdugo company had agreed among themselves, not to compel payment of such assessment or of such unpaid subscriptions in order that there might be no money on hand wherewith to pay the principal or interest due on the bonds which had been issued by the Verdugo company, thereby allowing the property of that company to be sold at trustee's sale.

Prior to the trustee's sale to the Crescenta company the board of directors of the Verdugo company had induced more than fifty per cent of the stockholders to request the trustee to sell the property under the trust deed. Pursuant to such request the trustee sold the property, as we already have stated. The majority of the bondholders requesting such sale were and are stockholders of the Crescenta company. The latter company employed counsel to attend the sale and to attend to the negotiations whereby the trustee was requested to sell the property.

It further is alleged, on information and belief, that the properties which the trustee sold to the Crescenta company for $10,595 had a total value of $294,734.16; that the sum bid is grossly inadequate, and that if the sale be permitted to stand plaintiffs will receive only a fraction of the value of the bonds which they hold. Wherefore plaintiffs pray that "the said sale so conducted and held on the eighteenth day of June, 1921, be declared void and of no effect, and set aside."

In considering whether the complaint states a cause of action two questions present themselves: (1) Do the facts alleged show that the trustee should not have undertaken to sell the property to anyone whomsoever? (2) Do the facts show that this particular sale should not have been made? In determining the first of these questions the facts principally to be considered are: (1) The organization of the Crescenta company for the purpose, among others, of acquiring the properties of the Verdugo company when the same should be offered for sale by the trustee; (2) the failure of the stockholders and directors of the Verdugo company to supply, by assessment or "call," the necessary funds wherewith to meet the payments on the bonds as they

fell due, thereby ''allowing'' the property to be sold; and (3) the inducing of more than fifty per cent of the bondholders to request the trustee to sell the property under the trust deed.

[1] The mere organization of the Crescenta company by the stockholders of the Verdugo company for the purpose of acquiring the property of the latter company in the event that it should be sold at trustee's sale, standing alone and considered as an isolated fact, could not prejudice the right of the bondholders to cause the property to be sold to satisfy the bonds held by them if and when the Verdugo company should default in the payment of its bonds. ''It is of common occurrence that an insolvent corporation is compelled to go into liquidation. The individuals who compose it seek to save what they can from the wreck by organizing themselves in a new corporation, and buying such of the properties of the old corporation as they can profitably use in the new. No principle of law is violated by their forming the new organization; *and no right of the creditors of. the old organization is injured,* provided its assets are lawfully acquired by the new one.'' (*Armour* v. *E. Bement's Sons,* 123 Fed. 59 [62 C. C. A. 145].)   (Italics ours.)

[2] The fact that the stockholders of the Verdugo company contemplated a reorganization might possibly furnish them with a motive for disregarding plaintiffs' rights. But unless plaintiffs show that their rights have actually been invaded the law will not concern itself with a possible motive for their invasion. If it did, new complications would be introduced into suits which might seriously obscure their real merits. [3] If those bondholders who requested the trustee to sell the property—more than fifty per cent of all the bondholders—had the legal right to demand that a sale be made by the trustee, and if the sale was conducted according to the conditions provided by the trust deed, with due regard to the rights of all the parties, and was made to the highest bidder, the fact that the stockholders of the Verdugo company, in organizing the Crescenta company, had in mind the possible purchase of the properties by the new company could afford no ground for setting aside the sale.

[4] The failure of the stockholders and directors of the Verdugo company to supply the necessary funds by assess-

ment or "call" in order to prevent their company from defaulting on its bonds furnishes no reason why the property should not be offered for sale by the trustee on a proper request therefor by the holders of fifty per cent in amount of the bonds outstanding. The complaint alleges that "bondholders constituting more than fifty per cent of the bondholders" requested the trustee to sell the property. It is not alleged that all the bondholders other than plaintiffs were stockholders of either water company. The allegation is that "the majority of the bondholders requesting said foreclosure [i. e., the trustee's sale under the trust deed] were at the time of said organization [of the Crescenta company] and ever since have been stockholders of said Sierra Verdugo Water Company." This may be true and yet the owners of fifty per cent in amount of the bonds outstanding may not have been stockholders in either company, but may, nevertheless, have joined in the request for the trustee's sale. The fact that "the majority of the bondholders requesting said foreclosure" were stockholders of the Verdugo company is entirely consistent with the hypothesis that one or more of the bondholders who joined in the request for a sale by the trustee owned fifty per cent or more in amount of the bonds outstanding but did not constitute any part of that "majority of the bondholders" who were stockholders of the Verdugo company. Plaintiffs themselves owned less than five per cent in amount of the bonds outstanding. For aught that appears to the contrary, the "majority of the bondholders requesting said foreclosure," and who were "stockholders of said Sierra Verdugo Water Company," may have constituted no more than forty-eight per cent of all the bondholders, leaving at least forty-seven per cent, besides these plaintiffs, who were not stockholders in either the Verdugo or Crescenta companies. And of such forty-seven per cent, one or more persons may have owned at least fifty per cent in amount of all the outstanding bonds. Such person or persons, however few in number, owning fifty per cent in amount of the outstanding bonds and not being a stockholder in either of the water companies unquestionably would have the right to demand that the trustee sell the property. The complaint does not say that a trustee's sale shall be had on the request of fifty per cent of the bondholders. The allegation is that the trustee, under the mandate of the trust deed,

shall, on default in the payment of interest for six months or more, sell the property "upon the written request of the holders of fifty per cent in amount of the bonds." Therefore, even if we were to assume that those bondholders who, as stockholders, had neglected to supply the Verdugo company with funds sufficient to meet its bonds, could not rightfully demand a sale by the trustee, still there is nothing to show that the demand for the sale was not made by bondholders owning fifty per cent in amount of the bonds outstanding and who were not stockholders in either the old or the new company. [5] However censurable the stockholders may have been for their neglect to raise the money wherewith to pay the bonds without compelling resort to a sale under the trust deed, it is certain that such of the bondholders as were not stockholders had the indubitable right to demand a sale by the trustee. The burden is upon plaintiffs to plead and prove all the facts necessary to show an invalid sale. If they would claim that the sale is void because the holders of fifty per cent in amount of the outstanding bonds were of those stockholders who made it impossible for the Verdugo company to raise the necessary funds wherewith to pay the maturing interest on its bonds as it fell due, the burden was upon them to show that fact by appropriate averments in their complaint. This they have not done. For, as we have shown by an analysis of the complaint, the averments of that pleading are entirely consistent with the fact that fifty per cent or more of the outstanding bonds may have been held by one or more persons who held no stock in either water company. And, clearly, if fifty per cent of the bonds were held by persons who were not parties to the machinations of the alleged scheming stockholders, the holder or holders of such fifty per cent of the outstanding bonds had the right to demand of the trustee that it proceed to sell under the trust deed.

For these reasons we are satisfied that a sale of the properties by the trustee was the right of at least certain of the bondholders. Or, rather, the complaint fails to show that certain of the bondholders had not the right to demand a sale by the trustee. To sell the property was, therefore, a duty imposed upon the trustee under the terms of the trust which it had accepted. What was said by the United States circuit court of appeals in *Land etc. Co.* v. *Asphalt Co.* is

apposite here: "It was the right and duty of the trustee under the so-called mortgage or pledge to foreclose the same, when default had taken place, whether the company be solvent or insolvent, and it is not material to the trustee what remedies the company may have to collect money with which to pay the mortgage debt. No conduct of the stockholders, however reprehensible, could impair the remedy of the holders of certificates and of their trustee to enforce their security." (127 Fed. 14 [62 C. C. A. 36].)

[6] The fact that the bondholders who requested the trustee to sell the property were induced to do so by the directors of the Verdugo company cannot invalidate the sale. As we have pointed out, there is nothing to show that the holders of at least fifty per cent in amount of the outstanding bonds did not have the absolute right to demand that the property be sold after default in the payment of the interest. Having such right, it is of no moment how or for what reason those bondholders were induced to exercise their right.

[7] For the foregoing reasons we conclude that the complaint fails to show that it was not the trustee's duty to offer the property for sale and to sell it to any person or corporation who would make the highest and best bid. Indeed, we do not understand appellants to claim that the trustee should not have attempted to make any sale whatever. Even though the willful neglect of the stockholders of the Verdugo company to pay the balances due on their stock subscriptions may have been the cause of that company's insolvency, still appellants would not for that reason be apt to claim that the bondholders, themselves included, have suffered an impairment of their right to cause the property to be sold under the trust deed. The security afforded by that instrument, and the right to have the property sold as therein provided, should not be deemed to have been crippled merely because another right of the bondholders—their right to compel their immediate debtor, the Verdugo company, voluntarily to pay the principal and interest accruing on its bonds—may have been impaired or rendered less valuable by the neglect of the stockholders to pay their subscriptions or by the failure of the directors to levy and collect assessments. What appellants do claim, and this brings us to what we conceive to be the real contention on this appeal,

is that this particular sale should be set aside because the property was sold for an inadequate price, and that such inadequacy was accompanied by fraud in that the stockholders and directors of the Verdugo company fraudulently combined to wreck that company by refusing to levy and pay assessments and by organizing the Crescenta company to buy the property at an inadequate price.

The established rule in this state is that "mere inadequacy of price, however gross, is not itself a sufficient ground for setting aside a sale legally made. There must, in addition, be proof of some element of fraud, unfairness or oppression before a court will be justified in depriving the purchaser of his legal advantage." (*Rauer* v. *Hertweck*, 175 Cal. 280, 281 [165 Pac. 948]. See, also, *Bock* v. *Losekamp*, 179 Cal. 676, 677 [179 Pac. 516].) Appellants claim that they are entitled to have the sale set aside under this statement of the rule. They claim that the facts alleged by them in their complaint do show that, in addition to inadequacy of price, there was fraud and unfairness. But the accompanying fraud, unfairness, or oppression which will suffice to make inadequacy of price a ground for setting aside a sale must be such as accounts for and brings about the inadequacy of price. The rule is stated in Ruling Case Law as follows: "What causes in addition to inadequacy of price are sufficient to lead the court to withhold confirmation from a sale at a sacrifice cannot well be reduced to any general rule, but they must be such as were calculated to prevent the property from bringing its value, or something reasonably near what it should bring at a public sale, and which on the particular occasion have actually produced that effect." (16 R. C. L., p. 98.) In *Burton* v. *Kipp*, 30 Mont. 275 [76 Pac. 563], it is said: "It is not alleged that the sale in question was attended by any irregularity on the part of the sheriff or the plaintiff in the writ, or that any mistake, surprise, accident, misconduct or fraud intervened, *by which the inadequacy of price was brought about*. . . . Mere inadequacy of price, not attended by circumstances of fraud, misconduct, accident, mistake or surprise *tending to influence the result*, is not sufficient to invalidate such a sale. Otherwise the mere lack of competitive bids, or the intervening of any like circumstances whereby the price realized should be deemed inadequate, would be sufficient to render ques-

tionable the title obtained by sale under execution.'' (Italics ours.)

There is nothing alleged in plaintiffs' complaint from which even a remote inference can be drawn that the conduct which appellants stigmatize as fraudulent tended in anywise to bring about the inadequacy of the price bid for the property. There is nothing to show that the sale was not properly conducted in the utmost good faith on the part of the trustee, or that appellants did not have due and timely notice of the sale, or that the stockholders or directors of the Verdugo and Crescenta companies did aught to prevent competition in the bidding. So far as the allegations show to the contrary, the small price realized may have been the result of lack of bidders, or encumbrances upon the property, or a variety of other causes over which neither the trustee nor the stockholders or directors of either of the water companies had any control. Under the terms of the trust deed the bondholders had the right to have their claims satisfied by a sale of the property. The Crescenta company, the sole bidder, was under no obligation to bid more than it deemed proper. It was at liberty to bid what it wished, leaving it to others to make higher bids if they chose. Since the inadequacy of price was not attended by circumstances of fraud, misconduct, accident, mistake, or surprise which tended to influence the result by preventing the property from bringing its value, it follows that those bondholders who requested the trustee to sell—bondholders who are not complaining and who had the right to collect their claims in this manner—cannot be deprived of the fruits of this sale merely because the bid was not higher.

The judgment is affirmed.

Works, J., concurred.

CRAIG, J., Concurring.—I concur in the conclusion of the foregoing opinion.

However, I think the transaction, the completion of which appellant has sought to enjoin, cannot properly be termed a sale; it had amounted only to a contract to sell. While the distinction might not be material in the instant action, the inaccurate use of a legal word or expression often leads to confusion in subsequent cases. Opinions may be found

where the word "sold" has been loosely applied to transactions which had progressed no further than those in the present case, but they do not fit the definitions of the word as found in text-books, our Civil Code, or such cases as deal with it with care and accurateness.  A "sale" is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property.  (Civ. Code, sec. 1721.)  Here the transfer had not been made, and the injunction was asked to prevent it.  "An agreement to sell is a contract by which one engages, for a price, to transfer to another the title to a certain thing."  (Civ. Code, sec. 1727.)  This is precisely what the contracting parties did.

A contract relative to land, binding the vendor to make a deed, is a mere agreement to convey.  (*Ellis* v. *Jeans*, 7 Cal. 409; *Roberts* v. *Abbott*, 48 Cal. App. 779, 786 [192 Pac. 345].)  The same opinions hold the transactions therein respectively involved to constitute executory agreements. This, it seems to me, was clearly the legal status of the transaction in this case.  The Crescenta company made a bid of $10,595, at the trustee's sale, and until the trustee should have executed its deed, and the transaction thus have become an executed contract by a transfer and by payment of at least part of the purchase price by the vendee, only a contract to sell existed.